312-1007 ASG Staffing, Inc. v. Workers' Compensation Comm'n 312-1007 ASG Staffing, Inc. v. Workers' Compensation Comm'n 312-1007 ASG Staffing, Inc. There are two reasons for this. Number one, the primary issue is a two-doctor rule challenge, and that is primarily a question of statutory construction. You won't hear me arguing about IMEs or medical treatment. The providers are all in the record and acknowledged. Number two, the Workers' Compensation Commission never addressed our two-doctor argument. It was raised and never addressed. So like it or not, you will be the first reviewing body to address it. So you mean the Trans-Cabinet case, medical is in dispute. You brought the issue of the two-physician rule to the attention of the arbitrator specifically? Yes. You asked the arbitrator? I did not try the case. I believe that that was in the proposed decision. It was in the commission briefs. Well, then I'll ask opposing counsel, but otherwise you would have a problem. You've heard of the doctrine of forfeiture, haven't you? Yes. If you never raised that issue before the arbitrator, you'd have a problem. Understood. I believe the record is clear. Let's assume for the moment that you did, but otherwise we'll deal with it on the merits. But tell us why you believe the two-physician rule was violated here. I'm not so sure that's correct. Well, thank you, Justice Hudson. We believe there's four lines. There is a question with regard to Premier Orthopedic. Well, first of all, let me just set forth that it's agreed by both parties, at least on two lines. The first line is Dr. Reed to Dr. Pareja to Dr. Montella. That would be one line. And then the second line would be Dr. Ronald Michael would be two independent lines. It's our position that Premier Occupational Health represents a line of treatment, and that was the first provider that Ms. Rodriguez saw. How did she get there? Yeah, that's the first question. Who referred her to the treatment of Premier? The record suggests Andreas, who is not her supervisor. He is not identified further than that. He is simply referred to as Andreas. What did the claimant say about how she got there? Did she say? She said she went to the staffing department and Andreas sent her to Premier Occupational Health. From your staffing department? Correct. That's what the record reflects. Went over to staffing and reported it to Andreas, and Andreas instructed her to go to Premier Occupational Health for treatment. Now, if that's determined to be a referral by the employer, you haven't got a two-doctor problem, do you? Well, first of all, she was released by Premier Occupational Health to return to work that day, and she did not return to work. Subsequent to that, she began an independent line of treatment chronologically now with Dr. Reed on July 24, 2009, and saw him again on July 28, 2009. She returned to Premier Occupational Health on August 4, 2009. At least that visit is an independent choice. She's not working for us anymore. She had already exercised her first independent choice with Dr. Reed. Why did she return to Premier? Why did she? I have no idea, Justice. There's nothing there that says Premier gave her a date to return or anything like that? Counsel has argued that there's some phone notes in the record whereby one of the employees at Premier Occupational Health had attempted to contact her based on a missed appointment. Who does Dr. Reed work for? Dr. Reed? Grandview, I believe, Justice? Well, you referred to, you said, the line of treatment consisting of Dr. Reed. Right. How did she get to Reed? On her own. Reed had nothing to do with Premier? No. Okay. So basically Premier, arguably, second visit to Premier was based on a note or something for her to come back for a check or anything like that? Right. Or you're saying? She was missing appointments. Oh, but she was given an appointment at Premier to come back to Premier. Is that correct? Even though she missed them? Yes, I do believe that's correct. So her return to Premier could not necessarily be argued as an independent selection the second time. Right. She did begin exercising her own choice of doctors by this time, and she wasn't working. So Premier Occupational Health is an adjacent source. I want to understand something. She goes to Premier Occupational Health ostensibly at the recommendation of someone in your staffing department. She goes there on July 21st, and part of the, well, she's there. She gets a work come follow-up visit scheduled for July the 23rd. She goes on July the 23rd, gets another work come follow-up visit for July the 28th, but she blows that appointment. She doesn't go. But she presents herself to the facility on August the 4th. At that time, there's no improvement, and a follow-up visit with Premier is again scheduled. And she never goes back there. So why aren't all of those visits attributable to the employer? Well, our argument is that there's a paucity of evidence linking the referral from the employer, Andreas in this case, to Premier Occupational Health. In the alternative, though, we are arguing that once she began exercising her choices and she returns to Premier Occupational Health, while not contacting us and letting us know that she is able to return to work, she's essentially left our employment at this time. And she's returning to work at Premier Occupational Health, or she's returning to treat at Premier Occupational Health. It's an independent choice. It's an independent choice. That's the argument. Do you have a line of cases or any authority to say that if she goes to the facility she's referred to by the employer and they continue to suggest she go back there, that she goes back there, she's violating the two-physician rule? Cases that say that if she goes back there at any point after that, somehow that's not the employer's suggestion. It's her own independent choice. I guess my answer to that is no, I don't have anything specifically to address that. However, there's nothing on the other side as well. So in that case, I suppose it would be... You're just making an argument that once she's no longer an employer, you would like us to say that though she was referred to a medical provider by the employer, she returns after she's dismissed or leaves that employment, that becomes an independent choice. Well, yes. I mean, she's exercising. We have no control over her. We have no control over Premier Occupational Health at this point. She's simply choosing to treat them. It is a medical facility. She's a free woman and she can do that. Not to get too detailed or philosophical or deep into this, but if somebody goes to a facility, they like the doctor they're with, they have a rapport, according to you then, they couldn't go back there without being in jeopardy of violating this rule, even though they started with the person. Because once they're terminated, they've got to say, oh, you know, I'm fired now. I can't go back to the same facility I've been with because now I'm no longer employed. From a public policy standpoint, is that what we wanted to have done? Well, are we looking at the letter of the law in 8A? Is it an employer choice at that point? It's she's making the choice. But the people you sent her to keep telling her she's got to come back. Follow discipline. Assume we don't buy your argument. Let's move this on a little bit or you're going to get no argument on the real issues. Assuming that we don't buy your argument on Premier. Well, then I would submit that the argument we made on Bolingbroke Hospital is persuasive. Adventist? Is that the one you said? Adventist, Bolingbroke Hospital. But she was taken there by ambulance to the emergency room. And the case law, Supreme Court case law, Wolfe, or excuse me, appellate court case in 1985, Wolfe addresses that post-accident emergency room visits count as separate lines of treatment. And in this case, we have a woman. Where it didn't, where it wasn't a bona fide emergency. Exactly. That's what Wolfe says. Wolfe says it counts as a choice if it's not a bona fide emergency. In this particular case, I think there's an awful lot of evidence she was transported by ambulance. This was a bona fide emergency. And if it's a bona fide emergency under Wolfe, it doesn't count. It wasn't submitted. First, it's three months after our accident. And basically, at this point, she's treating. She's in the treatment process. It's submitted as related to this case. So as far as it being an exacerbation or something along those lines, that's not, there isn't a connection made to our case. But it is submitted. That's a different argument. A different argument is there's no causal connection between the injury she suffered at work for which she's seeking recovery from you and the treatment she received at Adventist has nothing to do with the two-doctor rule. The two-doctor rule only comes into play if she's being treated for the injury for which she's seeking recovery from you for. Okay. I would submit, though, that she, by treating at Wolfe, I think, or strike that. By treating at Adventist Bloomingbrook Hospital, we're looking at treatment that's now three months away. Whether or not it is a bona fide emergency, as a line of treatment within this case right here, I do think it is a separate line. And I think this does encompass Wolfe. And I think it also encompasses Pluto as well, which also addressed whether or not the provider is unavailable or available. And in this case, Ms. Rodriguez has argued that her provider was unavailable, but there's absolutely no reference in the records which support that intention. Why don't we move on to the TTD? You have an argument with part of the TTD, right? Correct. Okay. Which part and why? Essentially, there is an absence of off-work slips. And that is addressed primarily in the commission dissent by Commissioner Lambourne. He notes that the record is void of off-work slips at various times. And he notes that Petitioner, when she left our employee and began working for a new employer, did work from August 19 through October 29, 2009. Commissioner Lambourne also notes that Dr. Michael never provided a work slip, which supports her. And Petitioner began treating with Dr. Michael in January 2010. And Petitioner never submitted her work restrictions to ASG staffing. She never attempted to come back to work for us. So therefore, during these periods when she's on late duty, it would be incumbent upon her to request accommodation. And that just didn't happen. She sort of turned around and said, hey, they never asked me to come back specifically, so therefore, you know, I should get the TTD. You know, they're responsible to monitor her treatment and her off-work notes at that time. You know, it's not really on us to keep track of that. When did Dr. Reed completely take her off work without any restrictions? Just take her off. I'm sorry. When did Dr. Reed take her off work completely? Was that August 14, 2009? I believe it's August 14th or August 19th. Okay. Right, it's thereabouts. And the Arbuckle decision is cited in our brief as well on the TTD issue. And, you know, at minimum, the standard is that Ms. Rodriguez would have to show that she was unable to work, or not that she was unable to work, but that she, not just that she didn't work, but that she was unable to work. And that's why our arguments with regard to submitting her restrictions to us are valid. Any additional questions? Counsel, you may proceed. Good afternoon, Justices and Counsel. My name is John Burton. I represent Ms. Rodriguez. And I was just listening to your questions, and I wanted to point out one of the things that I think is sort of important regarding, this is now the TTD issue, I believe. On the day Marlene Rodriguez was hurt, her co-worker was her mother. And so she reported the accident to her supervisor, and they sent her to staffing, and the staffing sent her to the occupational health service, which is, I think, normal business. But there was another thing that happened that day, and it's on page 31 of the transcript, and I apologize for not putting this in my response. And what happens is they responded to her injury by laying her mother off, who's her co-worker. And the stipulation of counsel at that time, because, you know, we were questioning Ms. Rodriguez about her mother being fired that day, and they stipulated, and I'm reading now verbatim on page 31 of the transcript, I will stipulate that she was laid off, that the job changed. And that was not my stipulation. That was their stipulation. Who was laid off? Her co-worker, her mother. The job changed. In other words, the job was gone. She wasn't laid off. Her mother was. Right. Who was her co-worker? Because they worked together. They were working stacking computer boxes, monitors. And so I'm missing the point. What does that have to do with something else? So Marlene reports the injury. She goes to occupational health, and her mother is then told the job is over. So it's more than just they didn't call her back to work. They laid her mother off. What does that have to do with the question of whether she exceeded the two-doctor rule? Okay, now I'll get to the two-doctor rule. Or she's entitled to the TTD she got. Okay. You're losing me on that one. Okay. Now, I was dealing with the TTD issue. Do the two-physician rule first. Do the two-physician rule first. Section 882 outlines the two-physician rule, and the employer is liable to pay for all So she goes to Premier allegedly or ostensibly at the direction, a referral from the employer. We have the statute. We know the statute. So it's the initial service provider and everyone that follows for the employer. Okay. This is clearly that. This is like Concentra or any of these other. But he has a twist, then. He says, okay, I recognize the initial referral. But he says, what about the fact that she's going back there apparently after she's been terminated? And that's exactly why 882 says initial and everything that follows. Because she initially goes there, and then she goes back. And that's, I mean, I'm actually very proud of the legislators for putting the word initial in there, because it addresses this issue completely. So all of her visits to Premier are follow-up. Right. Exactly. Because she initially went to Premier. The statute specifically Premier is the initial one, then everyone that follows. Now, in this case, she didn't go to their subsequent provider. She went back, actually, to the initial one. It wasn't a follow-up or anything. It's still the initial person. And that's why they put the word initial in there. And they actually put it in two times. So it doesn't matter why she went back. No. It's the initial. Whether it was pursuant to an appointment she was given for a follow-up check or whatever. And in the records, they show that they actually called her. Could you, and I suppose you're going to tell us that Adventist was because it was a zero. Now, Adventist, so she and her mother are told the job is terminated. She then goes to OHL where she finds a sedentary job position. This is not a malingerer. She's a hardworking young girl. And she gets a job where it's sedentary. She's printing labels so she doesn't have to lift anything or do anything. And her condition was so bad that OHL, not her, they called an ambulance for her that day. And if you see throughout the records, she's not even able to ambulate a lot of times. She has these crutches and a cane. And so in this case, she didn't choose this. And this is not a situation where she's just too lazy to go to her doctor and walks into the local hospital and says, oh, you know, my back feels bad. I need a Motrin or something. They actually call an ambulance for her. And she didn't choose that. The employer called the ambulance and they took her by ambulance to Adventist. And once again, if you look at 882, they have to provide all emergency treatment. And that is an emergency. Once again, she didn't choose it even. The employer chose it, OHL. And like I said, at that time, she's unable to do sedentary work. Okay. Go on. Yeah. Go on to the TTD. So now back to the TTD issue. Could you just tell me, I want you to focus on a particular time period. Can you tell me what her entitlement to TTD was from July the 21st through August the 13th? And my belief would be, looking at page 31 of the transcript, clearly the employer ASG staffing terminated that job. They told her coworker, her own mother. And I think any reasonable person who's injured at work, and strangely, I get jobs like this, but I never work with my mother. I work with my brothers. They fire my brother when I go to the hospital for an injury and tell him the job's over. Any reasonable person would say, yes, the job is over. For me, too. So you have case law that says that she's entitled to assume that her job is over without any further communication with the employer. No. What I do have is common sense. I hope other people would say no. But I think the reasonable inference there and the one drawn by the commissioners and the arbitrator in the circuit court was, I mean, her coworker lived with her. It was her own mother. And they were told not that she was fired. They were told the job was over. And it was stipulated to them. Did the arbitrator or the commission say that was the basis for authorizing this TTD? No, they didn't. They didn't spell it out. Because, again, that's your logic and common sense telling us that. Right. But I think anyone in that position would come. I mean, like you said, if you're working at a place and, like you said, this is stipulated, she was laid off, the job changed. If it changed so her mother had a job, she clearly didn't have a job either. And I think any normal person would say that's the only rational conclusion you could have. Well, how do we know that the company, you want to speculate, wasn't going to put her in some other position in the company? They didn't do it to the mother. Well, so what? I mean, is this a tag team where they can't do something that prohibits them from maybe they liked her better than her mother, speculate. Who knows, right? Could be. But I think it was a rational decision made by her. They don't want me anymore. They laid the mom off in response. Can't anybody call and say, hey, do I still have a job or something along those lines? Well, Judge, I will stipulate she did not call. She waited for them to call, but she was dealing with her mother coming home that night saying, hey, the job is gone. Okay. She goes to Premier on July the 21st. Did they give her an off-duty slip? Not on that day. Okay. She goes for follow-up scheduled for July the 23rd. Did they give her an off-duty slip that day? No, Judge. In fact, didn't they say she was cleared to return to regular duty that day? Yes, they did. And they rescheduled for July the 28th. Yes. Now, does she get any off-duty slips between July the 28th and August the 4th? No, Your Honor. Okay. She follows up. So she still has no authorization to be off-duty. Correct. Then she consults on August 10th with Dr. Pereja. Did he give her an off-duty slip? I believe he gave her an off-duty slip until August the 14th. Correct. When she got an off-duty slip from Dr. Reed. For four weeks. Correct. So we've got no authorization to be off work from the 21st all the way to August 13th by any doctor. Correct. Okay. All right. dates for that inquiry?      We'll go to jury 12 with either at or with Mr. Davidson, please. I accept. And I think what you look at, and I agree that is sort of the issue here. Her reasonable belief based upon her mother being told work was no longer available was that since she was doing the exact same job, work was no longer available for her. And I think any rational person in that situation would find the same thing. I think any rational person in that position would say this was done in retaliation. And that's what she and her mother concluded. And do you have any further questions or issues? Otherwise, I'm done. Thank you very much, Your Honor. Thank you. Thank you, counsel. Counsel may reply. Now, can I ask you a question on this issue of the two judge or the two Dr. Rule? Do you forfeit an issue before us if you don't argue it before the arbitrator but you place it in your statement of its exceptions before the commission? No. I don't. So it's forfeited only when you don't raise it before the commission or you fail to raise it before the circuit court. Then the forfeiture rule comes into play. That's my understanding. Because the statute specifically says that the commission is authorized to review anything that happens before the arbitrator. Is that not true? That's my understanding, yes. Okay. So the failure to argue it before the arbitrator won't be the forfeiture, only the failure if you didn't put it in the statement of exceptions. Is it there in your statement of exceptions? In the statement of exceptions, I can't say with 100 percent certainty. All right. We will find out. I could. I certainly know that the briefs, I think, are in the record. So it should have been raised either in argument or in the contents of the brief. I just want to point out that I can't let it go without being said, on the Adventist Bolingbrook Hospital visit, she wasn't taken off work after that emergency room visit. I know we're trying to discuss this as a very emergent situation here in the discussion about crutches, and she had no choice and all this. But it was three weeks or, excuse me, three months after our accident. She wasn't taken off work after this, and she relates her symptoms to a pain shot she received a week in advance. So as far as whether this is an emergency, I'll leave that to your judgment, but I would submit that it is not. Nothing further? Thank you, counsel, both for your arguments. This matter will be taken under advisement, and a written disposition shall issue. Thank you.